**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. Case No. 24-cr-116 (JEB)** |
| **JUSTIN LaGESSE,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Justin LaGesse to 24 months' incarceration, three years' supervised release, $43,315 in agreed-upon restitution, and the mandatory $100 special assessment.

### I.    INTRODUCTION

The defendant, Justin LaGesse, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim

LaGesse, a welder and machinery operator from McLeansboro, IL, entered the Capitol building through a broken window next to the Senate Wing Door, while carrying a yellow Gadsden Flag.   He then turned around and helped his co-defendant, Theodore Middendorf, climb through the window.   LaGesse remained inside the Capitol building for approximately eleven minutes. After leaving the Capitol building, he harassed several police officers on the Capitol Grounds, calling them, among other things, "fucking traitors" and "fucking communist scum."

At approximately 4:09 p.m., LaGesse and Middendorf moved to the north side of the Capitol where a large group of rioters were attempting to breach the building through the North Door. Police officers, however, defended the door and blocked the rioters' entry. As the officers held back the rioters, LaGesse and Middendorf approached the nearby exterior window of room S-121 and struck the window with the bases of their flagpoles several times. Although the window appeared to be previously damaged, LaGesse and Middendorf's strikes caused additional damage to the window in several places.   After the riot, the Architect of the Capitol determined that the total cost of the damage to the window was $41,315.25.

As a result of the discovery provided in this case, LaGesse identified an individual that he believed to be a potential witness against him. On March 13, 2024, LaGesse sent numerous text messages to that individual, in which he said, among other things: "You called the fuckin FBI on me and wrote a statement!!!!!;" "Fuck you narc;" "People are going to know you're a narc now in mcleansboro;" and "Fuckin coward and a narc. Can't say shit and won't. Karma is a mother fucker … I hope you remember that when it gets you again."

---

officers, the government has sought restitution based on a case-by-case evaluation.

The government recommends that the Court sentence LaGesse to 24 months' incarceration for violating 18 U.S.C. § 1361. An 18-month sentence reflects the gravity of LaGesse's conduct and his admission of guilt.

## II.    FACTUAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 39, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.  LaGesse's Role in the January 6, 2021 Attack on the Capitol

#### *Approach and Entrance into the Capitol Building*

LaGesse participated in the January 6 attack on the Capitol. His crimes are documented through body worn camera videos recorded by Metropolitan Police Department officers, open-source video, and surveillance footage from the Capitol.

In December 2020, LaGesse and co-defendant Theodore Middendorf planned to travel to Washington, D.C. to protest the results of the 2020 presidential election. They then both traveled to Washington, D.C. on January 5, 2021.   On January 6, 2021, LaGesse and Middendorf wore matching shirts, which said "FUCK ANTIFA" in red-and-white text on a black background.

On January 6, 2021, at approximately 2:51 p.m., LaGesse entered the Capitol building by climbing through a broken window next to the Senate Wing Door.   When LaGesse entered the Capitol, he was holding a yellow Gadsden flag. After entering, LaGesse then turned, took an American flag from Middendorf, and helped Middendorf enter through the window.

3



***Image 1:*** *a still image taken from Capitol surveillance footage, showing LaGesse (circled in yellow) entering the Capitol through a broken window next to the Senate Wing Door.*

LaGesse and Middendorf remained inside the Capitol for the next eleven minutes, traveling together to the Crypt and to the House Side of the Capitol Building.

LaGesse and Middendorf then left the Capitol through the South Door at 3:02 p.m.



***Image 2:*** *a still image taken from Capitol surveillance footage, showing LaGesse (circled in yellow) walking past the House Wing Door at 3:01 p.m.   Middendorf walks to LaGesse's right.*

### *LaGesse's Conduct Outside the Capitol Building*

After leaving the Capitol building, LaGesse and Middendorf approached a line of Metropolitan Police Department ("MPD") officers standing behind a bicycle rack barricade. As they approached the officers, LaGesse called the officers "fucking traitors" and "fucking communist scum." LaGesse continued yelling at the officers for several minutes.



***Image 3:*** *a still image taken from MPD body-worn camera footage, showing LaGesse (circled in yellow) shouting at MPD officers.*

Once he was done cursing at the police officers, LaGesse and Middendorf moved to the north side of the Capitol building, where they encountered a group of rioters attempting to breach the North Door and enter the building. At approximately 4:09 p.m., as police officers tried to stop these rioters, LaGesse and Middendorf approached a large exterior window to the left of the North Door, which is the window to room S-121. LaGesse and Middendorf then used the bases of their flagpoles to strike the window numerous times, damaging the window in several places. The Architect of the Capitol determined that the total cost to repair the damage to the window was $41,315.25.





***Images 4 and 5:*** *still images taken from an open-source video showing LaGesse (circled in yellow) and Middendorf damaging the window to room S-121.*

*LaGesse's Conduct After January 6*

During LaGesse's review of the materials produced in discovery for this case, he identified an individual who he believed to be a possible witness against him. In retaliation, on March 13, 2024, LaGesse sent numerous text messages to that individual, in which he said, among other things, "You called the fuckin FBI on me and wrote a statement!!!!! WTF . . . That's pretty fuckin low!!! . . . Gotta love a motion of discovery." Several hours later, LaGesse again texted the witness, "What the hell did I ever do to you for you to call the FBI on me and narc me out? Have my whole lol ife [sic] destroyed." He continued two hours later, texting, "I wouldn't answer or say anything either!! Fuck you narc". That evening, LaGesse texted, "People are going to know you're a narc now in mcleansboro . . . Fuckin coward and a narc. Can't say shit and won't. Karma is a mother fucker . . . I hope you remember that when it gets you again."

## III.    THE CHARGES AND PLEA AGREEMENT

On March 6, 2024, a federal grand jury returned an indictment charging LaGesse and his co-defendant Middendorf with seven counts: (1) Destruction of Government Property, in violation of 18 U.S.C. § 1361 and 2; (2) Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (3) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (4) Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); (5) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); (6) Engaging in an act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F); and (7) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). ECF No. 12. On September 23, 2024, LaGesse was convicted of violating felony

18 U.S.C. § 1361 based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

LaGesse now faces sentencing on Count One for violating 18 U.S.C. § 1361.

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, LaGesse faces up to 10 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100. *See* ECF No. 47 at ¶¶ 114, 121, and 132; ECF No. 32, pg. 1.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.  Calculation of LaGesse's adjusted offense level

According to the PSR, the U.S. Probation Office calculated LaGesse's adjusted offense level under the Sentencing Guidelines as follows:

Count One: 18 U.S.C. § 1361

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(2) | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(1)(B) | Special Offense Characteristics | +6 |
| U.S.S.G. § 3C1.1 | Obstructing the Administration of Justice | +2 |
| **Total Adjusted Offense Level** | | **14** |

*See* PSR ¶¶ 40-50.

The Plea Agreement between the parties reflected the same calculation. *See* Plea Agreement at ¶ 5(A).

LaGesse explicitly reserved the right to contest the application of Obstructing the Administration of Justice under U.S.S.G. § 3C1.1 at sentencing. The Plea Agreement reflects the Government's agreement that, if the Court finds that U.S.S.G. § 3C1.1 does not apply, a 2-level reduction will be appropriate, pursuant to U.S.S.G. § 3E1.1, provided that LaGesse clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution, adherence to every provision of this Agreement, and conduct between entry of the plea and imposition of sentence.

The U.S. Probation Office correctly calculated LaGesse's criminal history as category II, which is not disputed. PSR ¶ 54. At the time the plea agreement was entered into, based upon the information then available to the Government, the Government believed that LaGesse had no criminal convictions, and estimated his Criminal History Category to be I. See Plea Agreement at ¶ 5(B). LaGesse acknowledged in the plea agreement that if, after the pre-sentence investigation, he was found to have criminal convictions, his criminal history score could increase or decrease. Id.

Accordingly, based on the government's calculation of LaGesse's total adjusted offense level at 14, LaGesse's Guidelines imprisonment range is 18 to 24 months' imprisonment.

**B.  The adjustment under U.S.S.G. § 3C1.1 applies.**

The parties agree as to the basic offense characteristics, as encapsulated in the plea, but disagree as to U.S.S.G. § 3C1.1 and its effect on acceptance of responsibility.  The Government submits that LaGesse obstructed justice in this case, and the adjustment under U.S.S.G. § 3C1.1 applies. LaGesse disagrees. *See* Defense Objections to the Presentence Report.

Section 3C1.1 of the Guidelines increases a defendant's offense level for obstruction, or attempted obstruction, of justice, as follows:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

Application Note 4(A) to the Section lists "threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . directly or indirectly, or attempting to do so" as an example of the type of conduct to which this adjustment applies.

LaGesse argues that his messages to a potential witness—in which he stated, "You called the fuckin FBI on me and wrote a statement!!!!!;" "Fuck you narc;" "People are going to know you're a narc now in mcleansboro;" and "Fuckin coward and a narc. Can't say shit and won't. Karma is a mother fucker . . . I hope you remember that when it gets you again"—were "an emotional reaction to learning of [the witness's] involvement, not an attempt to obstruct justice." Defense Objections to the Presentence Report, at 1.   LaGesse is incorrect.   His messages were an attempt to threaten, intimidate, or otherwise unlawfully influence a witness, and U.S.S.G. § 3C1.1 applies to his conduct.

LaGesse's messages were inherently obstructive, and the Court need not make a separate finding of specific intent to obstruct justice.   LaGesse argues that "[a]lthough the government can show that [he] was communicating with a potential witness, communicating with a witness is not inherently obstructionist."   Defense Objections to the Presentence Report, at 2 (emphasis removed).   LaGesse is correct: not every act of communication with a potential witness is inherently obstructive.   His specific communication with the potential witness in this case,

however, were inherently obstructive. *See United States v. Reeves*, 586 F.3d 20, 23 (D.C. Cir. 2009) ("Where conduct is 'directly and inherently obstructive'—that is, where the defendant engages in 'behavior that a rational person would expect to obstruct justice'—the court may infer an intent to obstruct justice and need not make a separate finding of specific intent.") (quoting *United States v. Henry*, 557 F.3d 642, 646 (D.C. Cir. 2009)).    The text messages in question were not merely "communicating with a witness."   LaGesse repeatedly called a potential witness a "narc," and directly stated he was messaging the witness because he had learned of the witness's cooperation with the FBI.   He threatened to reveal the witness's cooperation with the investigation to the larger community ("People are going to know you're a narc now in mcleansboro"), and made threats against the witness directly connected to their cooperation with the investigation ("Karma is a mother fucker … I hope you remember that when it gets you again").   These threats, to a person LaGesse knew to be a potential witness against him in the active prosecution of his case, are ones that any rational person would expect to obstruct justice, by intimidating or unlawfully influencing a witness.

Moreover, LaGesse's specific intent to obstruct justice is clear from the context of his messages.   LaGesse repeatedly called the potential witness a "narc," and stated he was messaging the witness because he had learned of the witness's cooperation with the FBI.   LaGesse's proffered rationale—that he was "having an emotional reaction" and "letting the witness know what he thought of her", in the larger context of LaGesse's relationship with the potential witness—is belied by his own words, which clearly indicate an intent to obstruct justice, and which clearly indicate that the reason for his communication were the potential witness's involvement in the case.   Defense Objections to the Presentence Report, at 2; *see, e.g.*, *United States v. Chavarria*,

377 F.3d 475, 479 (5th Cir. 2004), *cert.* granted, judgment vacated, 543 U.S. 1111 (2005) in light of *United States v. Booker*, 543 U.S. 220, (2005), and judgment reinstated, 162 F. App'x 306 (5th Cir. 2006) (finding the District Court did not err in rejecting contention that a threat to an arresting officer was "an outburst made as a result of pain and not intended to hinder the investigation of the underlying offense").

In any event, if the Court does not find that the application of Section 3C1.1 is warranted, the Court certainly can and should take LaGesse's messages to the potential witness into account under 18 U.S.C. § 3553(a).

### C. Calculation of LaGesse's adjusted offense level if the Court declines to apply the adjustment under Section 3C1.1

If the Court declines to apply the adjustment under Section 3C1.1, LaGesse's adjusted offense level under the Sentencing Guidelines would be as follows:

Count One: 18 U.S.C. § 1361

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a)(2) | Base Offense Level | 6 |
| U.S.S.G. § 2B1.1(b)(1)(B) | Special Offense Characteristics | +6 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -2 |
| **Total Adjusted Offense Level** | | **10** |

*See* PSR ¶¶ 40-50; 8.

Accordingly, based on the government's calculation of LaGesse's total adjusted offense level at 10, if the Court declines to apply the adjustment under Section 3C1.1 and applies the adjustment under Section 3E1.1, LaGesse's Guidelines imprisonment range would be 8 to 14 months' imprisonment.

13

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, LaGesse's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

LaGesse entered the Capitol through a broken window, remained inside for eleven minutes, called police officers "fucking traitors," and finally helped damage a window that cost the Architect of the Capitol more than $40,000 to repair.   The nature and circumstances of LaGesse's offense were of the utmost seriousness, and fully support the government's recommended sentence of 24 months' incarceration.

### B.  The History and Characteristics of the Defendant

LaGesse is a welder and machinery operator who lives in McCleansboro, IL. PSR ¶ 96-104. The defendant has a history of arrest and conviction which weighs in favor of a lengthy period of incarceration:

- In 2008, the defendant was convicted of unlawful interference with a public utility in Hamilton County Circuit Court, Illinois, and sentenced to a 12-month conditional discharge. PSR ¶ 52.

- In 2012, the defendant was convicted of two counts of burglary in Jefferson County Circuit Court, Illinois. On May 22, 2011, LaGesse entered two separate buildings in Belle Rive, IL with intent to commit a felony or theft therein.   He was sentenced to six months incarceration and four years' probation. PSR ¶ 53.

14

The defendant's crimes on January 6 thus were not an isolated event in an otherwise law-abiding life. They came, instead, after multiple offenses. The defendant's history and characteristics weigh heavily in favor of a lengthy term of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. LaGesse's criminal conduct on January 6 was the epitome of disrespect for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Specifically, while LaGesse eventually accepted responsibility for his actions on January 6, 2021, by pleading guilty following his arrest, he still took the dangerous step of obstructing justice by threatening a person he perceived as a potential witness against him. *See, e.g.*, 18 U.S.C. § 1512(a)(2)(A) (threatening witnesses to prevent the testimony in an official proceeding).

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Amongst January 6 defendants, this obstructive and threatening conduct makes LaGesse stand out, and demonstrates the need to specifically deter him.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

16

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]  "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[4] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

To date, few defendants have been sentenced for a stand-alone violation of 18 U.S.C. § 1361. Notably, the damage LaGesse caused, which underlies his conviction for 18 U.S.C. § 1361, was significantly more costly than the damage underlying many of the other stand-alone violations of the section; additionally, none of the other defendants convicted of stand-alone violations of 18 U.S.C. § 1361 threatened witnesses in their cases.

In *United States v. Hunter Ehmke*, 21-cr-029 (TSC), the defendant kicked and punched out three exterior windows of the Capitol building adjacent to the Rotunda doors on the east side of the building. Unlike LaGesse, the defendant had never been arrested before January 6, and the cost to the Architect of the Capitol to repair the damage he caused was an order of magnitude lower— in Ehmke's case, it was $2,821. Ehmke also received points for acceptance of responsibility and did not threaten witnesses in his case; thus, his Guidelines range was substantially lower than LaGesse's. Ehmke ultimately received four months' incarceration, 36 months' supervised release, and paid $2,821 in restitution for his conduct, which was less damaging than LaGesse's.

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Troy Elbert Faulkner*, 21-cr-126 (BAH), the defendant kicked in several windowpanes on the west side of the Capitol building, which cost the Architect of the Capitol $10,560 to replace. While Faulkner had a criminal history category of III, he caused much less damage than LaGesse, did not threaten witnesses, received points for acceptance of responsibility, and had a much lower Guidelines Range. The defendant received a sentence of five months' incarceration, 36 months' supervised release, and $10,560 in restitution for his conduct which, again, was less serious than LaGesse's.

In *United States v. Isaiah Farnsworth*, 23-cr-0004 (AKM), the defendant joined in the destruction of an interior door inside the Capitol.  The Architect of the Capitol provided an estimate that the damage to the door cost $9,860 to replace.   That defendant had a criminal history category of III, but the calculation of his guidelines were based on a damage figure much lower than LaGesse's; Farnsworth did not threaten witnesses, received points for acceptance of responsibility, and had a much lower Guidelines Range. Farnsworth received a sentence of 3 months' incarceration, 36 months' supervised release, and $11,860 in restitution, for conduct which was less serious than LaGesse's.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to

restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that LaGesse must pay $43,315 in restitution, which reflects in part the role he played in the riot on January 6.[6]  Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Further, the Architect of the Capitol determined that the total cost of the damage to the window LaGesse struck with his flagpole to be $41,315.25.  LaGesse's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 118.

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   FINE

The defendant's convictions for violations of 18 U.S.C. § 1361 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2 (a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine. *See* PSR, ¶ 113.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months' incarceration, three years of supervised release, $43,315 in restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     */s/ John Oxenreiter*
JOHN OXENREITER
Assistant United States Attorney

21